TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-04-00389-CV






Ken Patton, Appellant


v.


Bobbie Kaye Jones, Individually; Barbara Ruth, Individually; John Wright, Individually;
St. John's United Methodist Church; Oak Hill United Methodist Church; The

Austin District of the United Methodist Church; and Southwest Texas

Conference of the United Methodist Church, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT

NO. GN304244, HONORABLE C. W. DUNCAN, JR., JUDGE PRESIDING





O P I N I O N



 Appellant Ken Patton urges that the trial court erred in dismissing his case for a lack
of subject matter jurisdiction because the First Amendment's ecclesiastical abstention doctrine, also
referred to as the ministerial exception, does not bar judicial review of his claims for defamation and
tortious interference with an employment contract. Appellees, Pastor Bobbie Kaye Jones, Pastor
Barbara Ruth, Pastor John Wright, St. John's United Methodist Church, Oak Hill United Methodist
Church, The Austin District of the United Methodist Church, and the Southwest Texas Conference
of the United Methodist Church (collectively, "The Church") respond that because Patton, as the
Director of Youth Ministries for the Oak Hill United Methodist Church, was employed in a
ministerial role, the Free Exercise Clause prohibits judicial review of the Church's actions and
communications leading to Patton's termination. We will affirm in part and reverse and remand in
part.


STANDARD OF REVIEW


 A motion to dismiss based on a lack of subject matter jurisdiction is functionally
equivalent to a plea to the jurisdiction challenging the trial court's authority to determine the subject
matter of a cause of action. Lacy v. Bassett, 132 S.W.3d 119, 122 (Tex. App.--Houston [14th Dist.]
2004, no pet.) (discussing dismissal based on ecclesiastical doctrine) (citing Bland Indep. Sch. Dist.
v. Blue, 34 S.W.3d 547, 554 (Tex. 2000)). We review the record de novo to determine whether the
trial court had subject matter jurisdiction. Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 928
(Tex. 1998). We consider only the evidence pertinent to the jurisdictional inquiry and do not weigh
the merits. County of Cameron v. Brown, 80 S.W.3d 549, 555 (Tex. 2002). Also, we construe the
pleadings in favor of the plaintiff, accepting all his allegations as true. Bland Indep. Sch. Dist., 34
S.W.3d at 555. To prevail, the defense must show that, even accepting all of the plaintiff's
allegations as true, an incurable jurisdictional defect remains on the face of the pleadings that
deprives the trial court of subject matter jurisdiction. Brenham Hous. Auth. v. Davies, 158 S.W.3d
53, 56 (Tex. App.--Houston [14th Dist.] 2005, no pet.).

 Construing the allegations in Patton's pleadings as true, and considering the
uncontested evidence, we find the following undisputed facts in the record. (1)

BACKGROUND


 Patton was employed by Oak Hill United Methodist Church as the Director of Youth
Ministries from April 2002 until October 31, 2002. (2) In that position, Patton was responsible for "the
administration and organizing of recreational events for the youth, such as camping outings and other
social gatherings. . . . [Patton] coordinated the transportation, . . . oversaw the logistics, . . . [and]
served as a chaperone." He also "managed the budget for the youth program, recruited [adult and
youth] participants, registered the attendees at events, [] collected participation fees from attendees,
[and] performed fundraising duties." As Director of Youth Ministries, Patton did not participate in
worship services or ceremonies, had no responsibility for the music or liturgy, did not assist with the
confirmation of youth, and was not required to teach religious classes or have religious training. 

 On October 24, 2002, appellee Jones (a Pastor at St. John's) discussed with appellee
Wright (an Associate Pastor at Oak Hill) whether Patton should be terminated from Oak Hill. 
According to handwritten notes taken by Pastor Wright, Pastor Jones told him about allegations that
Patton had upset congregation members by dating certain women and by putting his arm around girls
at church. Pastor Jones also described a rumor that Patton had used internet pornography as being
"unsolicited, anecdotal, [and] unsubstantiated." Patton contends that each of the rumors are false. 
 After this conversation, Pastor Wright relayed these rumors to appellee Ruth (a Pastor
at Oak Hill). Pastor Ruth then met with the Staff Parish Relations Committee ("SPRC") and
recommended that Patton be terminated from his position as Oak Hill's Director of Youth Ministries. 
Pastor Wright informed Patton of the decision. Shortly beforehand, Patton had discovered Pastor
Wright's handwritten notes laying on the church photocopy machine. 

 In a subsequent letter to two concerned members of the congregation, the committee
chairwoman (3) wrote, 


Please know that this committee and your pastors share your concern for the youth
program. . . . A search for a new youth director will begin after the first of the year .
. . . Before any action was taken, the Pastors discussed the situation with the District
Superintendent and sought the backing of the SPRC, . . . [which] unanimously voted
to accept the recommendation to support the decision reached by [Jones], [Wright],
and myself. . . . I can assure you that [we] approached this decision prayerfully and
in the best interests of the church. . . .



Patton also alleged that the chairwoman told a member of the congregation who asked about Patton's
termination that, "It is really bad" and "We had to get him out before something happened at our
church," and that Pastor Ruth responded to a member's question by stating, "[Patton] knows why
he was fired" and "he wouldn't want anyone else to know."

 Patton sued the Church, claiming it was liable for defamation and tortious interference
with an employment contract. The Church defendants filed a joint motion to dismiss, which was
granted by the trial court. This appeal followed. The sole question presented on appeal is whether,
based on First Amendment principles, the trial court correctly determined that it lacked subject
matter jurisdiction.

ANALYSIS

Free Exercise Clause


 The First Amendment provides in relevant part that "Congress shall make no law
respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend.
I. The Establishment and Free Exercise Clauses apply to the states by incorporation through the
Fourteenth Amendment. Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 8 (2004). 

 The Supreme Court interpreted the basis of the Free Exercise Clause at issue here in
Watson v. Jones, 80 U.S. 679, 728-33 (1872). In often-quoted language, the Court held that "civil
courts exercise no jurisdiction . . . where a subject-matter of dispute [is] strictly and purely
ecclesiastical in its character," such as disputes "concern[ing] theological controversy, church
discipline, ecclesiastical government, or the conformity of the members of the church to the standard
of morals required." Id. at 733. Instead, civil courts are to accept "as final, and as binding on them"
the decisions of an ecclesiastical institution on such matters. Id. at 728. "[I]t would be of vain
consent," the Court held, "if anyone aggrieved by one of [an ecclesiastical institution's] decisions
could appeal to the secular courts and have them reversed. It is of the essence of these religious
unions, and of their right to establish tribunals for the decision of questions arising among
themselves, that those decisions should be binding in all cases of ecclesiastical cognizance." Id. at
730. In part, this is because ecclesiastical institutions "are the best judges of what constitutes an
offense against the word of God" and "of matters of faith, discipline, and doctrine; and civil courts,
if they should be so unwise to attempt to [decide such matters], would only involve themselves in
a sea of uncertainty and doubt." Id. at 732 (citations omitted).

 In the 135 years since Watson, many courts have applied these principles--often
referred to as the "ecclesiastical abstention doctrine" or the "ministerial exception"--to cases
concerning employment decisions by religious institutions. (4) These cases have consistently held that
civil courts lack subject matter jurisdiction to decide such controversies if the employment decision
concerns a member of the clergy or an employee in a ministerial position. See, e.g., Starkman v.
Evans, 198 F.3d 173, 176 (5th Cir. 1999); Green v. United Pentecostal Church Int'l, 899 S.W.2d
28, 30 (Tex. App.--Austin 1995, pet. denied). (5) 

 The "ecclesiastical abstention doctrine" provides a broader analysis that encompasses
the "ministerial exception." The ecclesiastical abstention doctrine prevents secular courts from
reviewing many types of disputes that would require an analysis of "theological controversy, church
discipline, ecclesiastical government, or the conformity of the members of the church to the standard
of morals required." Watson, 80 U.S. at 733. (6) In cases relying on the ecclesiastical abstention
doctrine, courts consider the substance and nature of the plaintiff's claims to determine whether the
First Amendment prevents subject matter jurisdiction. See, e.g., Williams v. Gleason, 26 S.W.3d 54,
58-60 (Tex. App.--Houston [14th Dist.] 2000, pet. denied). 

 More narrowly, if the claim challenges a religious institution's employment decision,
the sole jurisdictional inquiry is whether the employee is a member of the clergy or otherwise serves
a "ministerial" function. See Alicea-Hernandez v. Catholic Bishop of Chicago, 320 F.3d 698, 703-04 (7th Cir. 2003) (declining to consider whether substance of claim was secular in nature because
only relevant question was characterization of job function). If the employee is a minister, then the
"ministerial exception" applies, preventing secular review of the employment decision without
further question as to whether the claims are ecclesiastical in nature. See Rayburn v. General
Conference of Seventh-Day Adventists, 772 F.2d 1164, 1167-68 (4th Cir. 1985); see also Combs v.
Central Tex. Annual Conference of the United Methodist Church, 173 F.3d 343, 350 (5th Cir. 1999)
(employment claims by ministers "necessarily intrude into church governance in a manner that
would be inherently coercive, even if the alleg[ations] [] were purely nondoctrinal"); Abrams v.
Watchtower Bible & Tract Soc'y, 715 N.E.2d 798, 803 (Ill. App. 1999) (review of ecclesiastical
decisions, "particularly those pertaining to the membership or hiring and firing of clergy, are in
themselves an 'extensive inquiry' into religious law and practice, and therefore, forbidden by the
First Amendment"). The reason for this special rule for employment decisions about ministers is
because


[t]he relationship between an organized church and its ministers is its lifeblood. The
minister is the chief instrument by which the church seeks to fulfill its purpose. 
Matters touching this relationship must necessarily be recognized as of prime
ecclesiastical concern. . . . 


[Inquiry into a church's decision regarding the] employment relationship existing
between [] a church and its minister would result in an encroachment by the State
into an area of religious freedom which it is forbidden to enter by the principles of
the free exercise clause of the First Amendment.



McClure v. Salvation Army, 460 F.2d 553, 558-60 (5th Cir. 1972) (establishing ministerial exception
based on general principle espoused in Watson, 80 U.S. at 733, that secular courts lack subject matter
jurisdiction to review ecclesiastical matters). 

 Thus, in resolving whether the trial court had subject matter jurisdiction over Patton's
claims, we will first address whether Patton's job function was "ministerial." If so, then pursuant
to the ministerial exception, Patton's claims for defamation and tortious interference are not subject
to secular review, to the extent that they are connected to the church's decision to terminate his
employment. However, portions of his claims that are not connected to the employment decision 
are not necessarily barred from review by the First Amendment. 


Whether Patton's Job was "Ministerial"


 Whether an employee of a religious institution is a "minister" is a question of law for
the court. Starkman, 198 F.3d at 176. The ministerial exception has not been limited to members
of the clergy. Rayburn, 772 F.2d at 1169. Rather, it "encompasses all employees of a religious
institution, whether ordained or not, whose primary functions serve its spiritual and pastoral
mission." EEOC v. Catholic Univ. of Am., 83 F.3d 455, 463 (D.C. Cir. 1996). An employee's job
title is not dispositive. Alicea-Hernandez, 320 F.3d at 704 n.4. Instead, we must consider the
realities of the "function of the position at issue" to determine whether the position is ministerial in
nature. EEOC v. Roman Catholic Diocese of Raleigh, 213 F.3d 795, 801 (4th Cir. 2000). "As a
general rule," an employee's position will be considered "ministerial" if his or her "primary duties
consist of teaching, spreading the faith, church governance, supervision of a religious order, or
supervision or participation in religious ritual and worship" or if the "position is important to the
spiritual and pastoral mission of the church." Rayburn, 772 F.2d at 1169. However, the "exception
would not apply to employment decisions concerning purely custodial or administrative personnel
. . . [w]here no spiritual function is involved." Roman Catholic Diocese, 213 F.3d at 801. 

 The Fifth Circuit articulated a three-part test in Starkman v. Evans to determine
whether an employee's primary duties are ministerial in nature: (1) "whether employment decisions
regarding the position at issue are made 'largely on religious criteria,'" (2) "whether the plaintiff was
qualified and authorized to perform the ceremonies of the Church," and (3) "probably most
important is whether [plaintiff] 'engaged in activities traditionally considered ecclesiastical or
religious.'" 198 F.3d at 176-77 (citations omitted). The Starkman court held that it is "sufficient"
to deem an employee's function "ministerial" if only the third prong is satisfied. Id. at 177 (choir
director was minister because religious "music constitutes a form of prayer that is an integral part
of worship").

 Many courts have analyzed whether a particular employee qualifies as a "minister"
using the general standards set forth in Rayburn and the "primary duties" test articulated in
Starkman. The parties have not cited, nor have we found, any case presenting the exact question
here--whether a Director of Youth Ministries, who does not preach or teach but instead administers
and oversees the church's youth-group activities and fundraising, holds a "ministerial" position. 
Thus, we review the types of employees who have and have not been deemed "ministers" in other
cases. (7) 

 We find particularly instructive the cases involving positions that are partly
administrative in nature and do not require the employee to participate in worship activities or to
teach religious doctrine (unlike positions traditionally considered "ministerial," such as reverends,
priests, nuns, missionaries, and the like). In Alicea-Hernandez v. Catholic Bishop of Chicago, the
Hispanic Communications Manager for the Catholic church was responsible for "press secretary"
duties including: composing media releases, correspondence, and church publications; developing
relationships with the Hispanic media and community; and translating church materials into Spanish. 
320 F.3d at 703-04. Her duties did not include participating in worship activities or religious
teaching. Id. Although Alicea-Hernandez's duties were facially administrative, the Seventh Circuit
concluded her position was ministerial in nature because, ultimately, her role was critical in
disseminating the church's message, and the "[d]etermination of whose voice speaks for the church
is per se a religious matter." Id. at 704 (citations omitted). 

 Similarly, in Pardue v. Center City Consortium Schools of the Archdiocese of
Washington, Inc., the principal of a Catholic school was deemed a "minister," although she claimed
to function only in an administrative capacity and was not responsible for leading any worship
activities or teaching religious classes. 875 A.2d 669, 677 (D.C. App. 2005). The court held that,
as "chief administrator . . . she would certainly be expected to perform numerous duties--secular
in appearance--designed to meet public licensing requirements and to maintain the standing of the
institution as a school. But she was also . . . answerable to the religious authorities for providing,
in a myriad of ways not reducible to a listing of tasks, 'spiritual leadership in and for the school
community.'" Id.; see also Shaliehsabou v. Hebrew Home of Greater Wash., Inc., 363 F.3d 299, 309
(4th Circ. 2004) ("mashgiach," who was responsible for maintaining kosher kitchen, was minister
"given the importance of dietary laws to the Jewish religion").

 Patton's position as Director of Youth Ministries undoubtedly included several
administrative duties, such as coordinating the transportation, logistics, and other travel
arrangements for youth outings and gatherings. Yet, by his own testimony, Patton was responsible
for "organizing" these events, meaning that he made decisions on behalf of the church about what
activities the members of its youth ministry would participate in. The purpose of a church organizing
a youth-group retreat is to bring people together in fellowship, often coupled with religious worship
or reflection. Even if Patton was not teaching the doctrine himself, he testified that he was actively
participating as a chaperone. Organizing and chaperoning these events for the youth ministry are
activities that furthered the church's mission, which went beyond purely secular tasks such as
booking a chartered bus, collecting payments from the participants, or reserving cabins for a retreat. 
Furthermore, Patton averred that he "managed the budget for the youth program." Had Patton been
responsible merely for accounting, this function might be viewed as solely secular because he would
not have any discretion over the use of church funds. But, as the director of the program who
"managed" the budget, Patton was authorized to decide how the church's money was best used in
furtherance of ministering to its youth. Because Patton was responsible for deciding what activities
the church's youth group would participate in and how the program's money would be spent, he was
"answerable to the religious authorities for providing, in a myriad of ways not reducible to a listing
of tasks, 'spiritual leadership in and for the [youth ministry].'" See Pardue, 875 A.2d at 677. 

 Notably, Patton's affidavit also states that he "performed fundraising duties" and
"recruited participants" for the program. There is no question that asking people to give their time
and money to support activities of the youth ministry is a function that is "important to the spiritual
and pastoral mission of the church," especially in light of the fact that Patton was also responsible
for deciding how to use that money and how to organize those events. See Rayburn, 772 F.2d at
1169. In fulfilling these duties, Patton would be directly communicating the mission of the program
to individuals and encouraging them to participate either financially or physically. 

 Thus, even accepting Patton's allegations as true, it is apparent on the face of his
pleadings that he was acting both as the "voice" of the youth ministry and serving as a "primary
agent" of the church. See Davies, 158 S.W.3d at 56. "Determin[ing] whose voice speaks for the
church is per se a religious matter," Alicea-Hernandez, 320 F.3d at 704, and determining who will
serve as a "primary agent by which a church seeks to fulfil its purpose" is precisely the type of
ecclesiastical decision that the First Amendment intends to protect. Dean v. Alford, 994 S.W.2d 392,
395 (Tex. App.--Fort Worth 1999, no pet.); see also Watson, 80 U.S. at 733. Considering the
Starkman "primary duties" test, then, (1) the church's employment decision regarding Patton's
position would be based 'largely on religious criteria,' and (2) Patton's organizing of, as well as his
budgeting, fundraising, and recruiting participants for youth ministry activities are things
"traditionally considered [to serve an] ecclesiastical or religious" purpose. See 198 F.3d at 176-77. (8) 
Accordingly we hold that, as Director of the Youth Ministry for the United Methodist church, Patton
functioned in a ministerial capacity. 



Whether Dismissal of Claims was Proper


 Because "churches must be free to decide for themselves, free from state interference,
matters of church government as well as those of faith and doctrine," the actions taken and the
communications made by the Church as part of its employment decision about Patton's ministerial
position are ecclesiastical matters protected from secular review by the Free Exercise Clause. See
Combs, 173 F.3d at 350 (quoting McClure, 460 F.2d at 560); Rayburn, 772 F.2d at 1169. Thus, the
trial court was correct to dismiss for a lack of subject matter jurisdiction Patton's claims for (1)
tortious interference with his employment contract and (2) defamation, to the extent that it was based
on statements made in furtherance of the Church's decision to terminate Patton. 

 However, Patton also alleged as defamatory the chairwoman's letter to concerned
parishioners, as well as the chairwoman's and Pastor Ruth's answers to questions from members of
the congregation. Because these statements were made after the Church's employment decision was
final, they cannot be said to have been made in furtherance of the Church's decision. 

 We find Drevlow v. Lutheran Church instructive on this issue. In Drevlow, a pastor's
challenge to his church's decision to remove his name from the list of eligible ministers was an
ecclesiastical matter shielded from secular review. 991 F.2d 468, 471 (8th Cir. 1993). His claim for
defamation, however, was viable for judicial review because it was not connected to the church's
determination about "his fitness as a minister." Id. at 471-72. Consequently, the appellate court
reversed that portion of the lower court's dismissal and remanded it to provide Drevlow "an
opportunity to prove his secular allegations at trial." Id. at 472. In so doing, the appellate court
noted that it was unable to predict what evidence would arise and, therefore, cautioned the lower
court on remand to "limit the evidence at trial in order to avoid determining religious controversies." 
Id. at 471-72.

 Similarly, we are guided by Turner v. Church of Jesus Christ of Latter-Day Saints,
in which all of the minister's employment-related claims were deemed "ecclesiastical matters"
protected from review, but his defamation claim was not. 18 S.W.3d 877, 896 (Tex. App.--Dallas
2000, pet. denied). There, the allegedly defamatory statements were made to the minister's
grandparents, as opposed to being internal statements made by the church in connection with its
employment decision. Id. The court could "not perceive" any ecclesiastic reason for these
statements and, therefore, resolved that portion of the claim in Turner's favor. Id. at 896, 898; see
also Tran v. Fiorenza, 934 S.W.2d 740, 744 n.2 (Tex. App.--Houston [1st Dist.] 1996, no pet.)
(anticipating that minister's defamation claims against church may be subject to review if statements
"overstep the bounds of the authority's administrative duties" and "are clearly intended to defame
or inflict emotional distress"). (9) 

 Here, because the statements contained in the chairwoman's letter and made in
response to the congregation members' questions were outside the bounds of the Church's
employment decision, they do not appear to be of an ecclesiastic nature, and therefore should not
have been dismissed for lack of subject matter jurisdiction. Nonetheless, as in Drevlow, we cannot
predict the evidence that will be presented on the merits and, thus, we caution the trial court to
abstain from a review of ecclesiastical issues. See 991 F.2d at 471-72. As the court aptly stated in
Smith v. Raleigh District of North Carolina Conference of the United Methodist Church,


If it appears during the course of this litigation that a doctrinal issue must be
addressed to resolve plaintiffs' complaint, the court would not be precluded from
revisiting this issue. For purposes of this motion to dismiss, however, there is no
forecast of evidence suggesting that such an issue will arise.



63 F. Supp. 2d 694, 715 n.16 (E.D.N.C. 1999). Also, we note that we are not deciding the merits
of whether or not these statements were defamatory. That will be for the fact-finder to determine
on remand. Our holding is limited to the issue of whether or not, on the record before us, the trial
court had subject matter jurisdiction to review Patton's claims. 

CONCLUSION

 The trial court properly dismissed Patton's claims that were based on the Church's
decision to terminate Patton from his position as Director of Youth Ministries because this was a
"ministerial" role and the Free Exercise Clause of the First Amendment prohibits secular review of
a church's employment decisions about its ministers. See Rayburn, 772 F.2d at 1169. 

 Accordingly, we affirm the portion of the order that dismissed Patton's claims for
tortious interference with an employment contract and for defamation as it related to the Church's
employment decision. However, we reverse and remand the portion of the order that dismissed
Patton's defamation claims, to the extent they were based on statements made to members of the
congregation outside of the employment decision, to provide Patton an opportunity to prove the
merits of these claims.



 

 

 W. Kenneth Law, Chief Justice


Before Chief Justice Law, Justices Patterson and Puryear


Affirmed in Part; Reversed and Remanded in Part


Filed: May 11, 2006
1. The only evidence in the record was offered by Patton, consisting of his affidavit, a copy
of handwritten notes used in the Church's meeting about Patton's employment, and a letter from the
chairwoman of the parish committee that decided to terminate Patton. At the hearing on the motion
to dismiss, no testimony was offered; only argument by counsel was presented. 
2. Patton had previously served as the Interim Director of Youth at St. John's United
Methodist Church from August to December 2001.
3. Patton did not sue the chairwoman in her individual capacity but instead named the
Conference, asserting that the chairwoman acted as its agent.
4. Because these constitutional concepts have been discussed more extensively by the federal
courts, although not binding, we will look to the federal opinions that are "logically persuasive and
well-reasoned" for guidance. See Davenport v. Garcia, 834 S.W.2d 4, n.53 (Tex. 1992); see also
Bell v. Low Income Women of Tex., 95 S.W.3d 253, 266 (Tex. 2002). 
5. Although the First Amendment prohibits civil courts from exercising jurisdiction over
purely ecclesiastical matters involved in church-related disputes, the First Amendment does not
forbid civil courts from adjudicating property rights of the church or its members, so long as such
rights can be determined by the application of "neutral principles of law." Jones v. Wolf, 443 U.S.
595, 602-04 (1979); Hutchinson v. Thomas, 789 F.2d 392, 396 (6th Cir. 1986); Voice of Cornerstone
Church Corp. v. Pizza Prop. Partners, 160 S.W.3d 657, 671-73 (Tex. App.--Austin 2005, no pet.); 
Dean v. Alford, 994 S.W.2d 392, 395 (Tex. App.--Fort Worth 1999, no pet.). 
6. See, e.g., Lacy v. Bassett, 132 S.W.3d 119, 124-25 (Tex. App.--Houston [14th Dist.] 2004,
no pet.) (doctrine used to resolve issue of whether congregation member had right to access church
financial records, not involving employment decision); Nussbaumer v. Florida, 882 So. 2d 1067,
1077 (Fla. Dist. Ct. App. 2004) (doctrine applied in context of clergy communications privilege)
.
7. See, e.g., EEOC v. Roman Catholic Diocese of Raleigh, 213 F.3d 795, 801 (4th Cir. 2000)
(Director of Music Ministry was minister because "music is a vital means of expressing" religious
beliefs and employee was a "visible . . . leader of the congregation"); EEOC v. Catholic Univ. of
Am., 83 F.3d 455, 457 (D.C. Cir. 1996) (nun was "functional equivalent of a minister"); Rayburn
v. General Conference of Seventh-Day Adventists, 772 F.2d 1164, 1165, 1169 (4th Cir. 1985)
("associate in pastoral care intern" was minister because position involved "evangelical, liturgical,
and counseling responsibilities"); Smith v. Raleigh Dist. of N.C. Conference of the United Methodist
Church, 63 F. Supp. 2d 694, 706 (E.D.N.C. 1999) (church receptionist and secretary were "secular,
lay employees who performed non-religious, administrative tasks); Shirkey v. Eastwind Cmty. Dev.
Corp., 941 F. Supp. 567, 577 (D. Md. 1996) ("community developer" for non-profit Methodist group
was not minister because tasks of developing economy, reducing unemployment, and improving
quality of life in community were secular in nature); Turner v. Church of Jesus Christ of Latter-Day
Saints, 18 S.W.3d 877, 889-96 (Tex. App.--Dallas 2000, pet. denied) ("missionary" was minister
because essential tasks were to preach gospel and perform baptisms); Dean, 994 S.W.2d at 395
(Baptist pastor was minister); Tran v. Fiorenza, 934 S.W.2d 740, 744 (Tex. App.--Houston [1st
Dist.] 1996, no pet.) (Catholic priest was minister); Green v. United Pentecostal Church Int'l, 899
S.W.2d 28, 30 (Tex. App.--Austin 1995, pet. denied) (Pentecostal reverend was minister); see also
Weissman v. Congregation Shaare Emeth, 839 F. Supp. 680, 682 (E.D. Mo. 1993) (claims by
Temple Administrator, whose position was both secular and religious, were barred from review by
First Amendment because would require review of ecclesiastical matters); Williams v. Gleason, 26
S.W.3d 54, 59-60 (Tex. App.--Houston [14th Dist.] 2000, pet. denied) (church's discipline of
Sunday-school teacher was ecclesiastical matter); Patterson v. Southwest Baptist Theological
Seminary, 858 S.W.2d 602, 605 (Tex. App.--Fort Worth 1993, no writ) (seminary's termination of
theology professor was ecclesiastical matter). 
8. Although the record does not demonstrate that Patton was "qualified and authorized to
perform the ceremonies of the Church
," there is no requirement that all three Starkman factors be
satisfied to determine that an employee's primary duties are ministerial. 
9. Although Turner was decided in the context of a summary judgment rather than a motion
to dismiss, we find it persuasive because the essential issue was the same as here: whether, when
considering the evidence in favor of the plaintiff as true, the plaintiff's claims are nonetheless barred
as a matter of law based on a lack of subject matter jurisdiction. See 18 S.W.3d at 885-86, 898. 
Furthermore, Turner's holding relied on Drevlow, which (like the instant case) was based on a
motion to dismiss. See id. at 896 (citing Drevlow v. Lutheran Church, 991 F.2d 468, 471-72 (8th
Cir. 1993)).